IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

           Plaintiff,
vs.                              **Case No. 12-40020-01-RDR**

JENNIFER HUGHES-BOYLES,

           Defendant.

**MEMORANDUM AND ORDER**

This case is before the court as part of the sentencing process. Defendant has pleaded guilty to an Information charging defendant with a bank fraud scheme in violation of 18 U.S.C. § 1344. Under 18 U.S.C. § 3663A, the court must order that defendant make restitution to the victims of an offense committed by fraud or deceit. This order will present the court's findings as to restitution.

On May 30, 2012, the court conducted a hearing where both sides had an opportunity to present evidence as to restitution. The parties were given 10 days after the hearing to file briefs with the court. The court has reviewed the materials before it and shall make the following findings.

I. Background

Defendant pleaded guilty to Count 1 of an Information charging her with a "scheme and artifice" to defraud the Heritage Bank of Topeka, Kansas from "on or about March 2011, through on or about

May 2011." Doc. No. 1. The Information alleged that defendant, "a Vice President of the Bank, materially falsified loan applications, tax return information, credit scores and submitted other false information in order to qualify various otherwise unqualified purchasers of residential real estate from her as the seller, causing the Bank to fund approximately $2.8 million in loan proceeds, and allowing her to profit from the sales of real estate in an amount in excess of $500,000." Id. As a factual basis for her guilty plea, defendant agreed that during a two-month period "from approximately March 14, 2011, to May 9, 2011" she originated more than $2,000,000 in real estate loans. Doc. No. 13 at p. 11. She was aware that the Bank had a policy to require a 10% down payment or equity and to require borrowers to meet certain credit score criteria and prove adequate income or cash flow to support a loan. Nevertheless, she provided false documentation to the Bank's loan committee by fabricating or altering credit scores on applications or falsely showing the borrowers were making a down payment, in order for the loans to be approved. The borrowers used the money from the loans to purchase real estate from defendant. Defendant had purchased the real estate on or about the same day the loans were approved. She then resold the property to the borrowers at a substantial profit for defendant.

During the hearing conducted as to restitution, testimony and exhibits were introduced through Ernie Beaudet, the president of

Heritage Bank. Mr. Beaudet has extensive banking experience. Heritage Bank is the victim in this case.

Mr. Beaudet presented information regarding five loans made to two married couples as a result of false information supplied by defendant. Three of the loans (made on March 14, 2011, March 23, 2011, and March 24, 2011) were made to one married couple - - J. & A.H. The deeds to the property securing the loans have been returned to the Bank. Those properties are now listed for sale. Two of the loans (both made on June 22, 2011) were made to a different married couple, M. & J.H., and are in the foreclosure process. The property securing these loans are duplex units at 4412 SE Michigan, 4414 SE Michigan, 4334 SE Michigan, 4336 SE Michigan, 4330 SE Michigan, 4332 SE Michigan, 900 SE 44th, 902 SE 44th, and 4430 Oakview. There is also a single-family house at 2342 Roy Road which serves as collateral. All of these addresses are in Topeka, Kansas.

In Government's Exhibit 1, Mr. Beaudet summarized the loss claimed by the Bank, which was estimated at $712,144.89. In defendant's closing brief regarding restitution, defendant raises four issues regarding this figure. These issues pertain to: whether the claimed loss is sufficiently connected to the offense of conviction; whether the Bank's estimate of "closing costs" or "selling costs" should be included in the estimate of loss; whether the appraised value of the collateral should be discounted to

account for the historical sales performance of bank-owned property; and what is the better estimate of the market value of the property.  The court shall address those issues after a review of the relevant legal standards.

II.  Legal standards

"[T]he purpose of restitution is not to punish defendants or to provide a windfall for crime victims, but rather to ensure that victims, to the greatest extent possible, are made whole for their losses.  In making this determination a sentencing court may resolve restitution uncertainties with a view towards achieving fairness to the victim, so long as it still makes a reasonable determination of appropriate restitution rooted in a calculation of actual loss."  U.S. v. James, 564 F.3d 1237, 1246 (10th Cir. 2009) (interior quotations omitted).  Under § 3663A, the court must subtract the value of the property that has been or will be returned to the Bank from the loan proceeds disbursed by the Bank on the loans for which the Bank claims losses because of the offense of conviction.  In James, the court noted that the term "value" is not limited to the "fair market value" of the property at issue and that under some circumstances, the court has used a foreclosure price of the property to measure "value" for restitution purposes as opposed to fair market value. Id. at 1245-46.  "Value," in other words, is a flexible concept to be considered by the court in accordance with Congress's goal of

4

making victims whole for their actual losses.

III. <u>Connection to offense of conviction</u>

Defendant contends that the loans to M. & J.H. which were made on June 22, 2011 are not part of the offense in this case and should not be considered for purposes of restitution. Defendant notes that the Information in this case sets out a time frame of March 2011 to May 2011 and that the factual basis within the plea agreement discusses property that defendant purchased from CoreFirst Bank from March 14 through May 9, 2011. Obviously, the loans to M. & J.H. did not occur in March, April or May 2011. In addition, defendant asserts that the property she sold to M. & J.H. was not linked to CoreFirst Bank.

The court acknowledges that under the law, a restitution order "may only be ordered for losses caused by the offense of conviction." <u>U.S. v. Gordon</u>, 480 F.3d 1205, 1211 (10th Cir. 2007). But, when the offense involves as an element a "scheme" or pattern of criminal activity, a "victim" includes "any person harmed by the defendant's criminal conduct in the course of the scheme . . . or pattern." 18 U.S.C. § 3663A(a)(2).

In this case, the Information alleged a "scheme and artifice to defraud Heritage Bank" which occurred "[f]rom on or about March 2011, through on or about May 2011." Given the approximate dates described in the Information, the court believes the loans to M. & J.H. on June 22, 2011 may be considered part of the scheme alleged

in the Information. "On or about" means "reasonably near." See U.S. v. Charley, 189 F.3d 1251, 1272-73 (10th Cir. 1999). The court believes the loans on June 22, 2011 were reasonably near May 2011. This conclusion is supported by the discussion in Charley, 189 F.3d at 1272 where the court quoted Kokotan v. United States, 408 F.2d 1134, 1138 (10th Cir. 1969) for the proposition that "if the prosecution proves that the offense was committed within a few weeks of the date [in the indictment], the proof will be deemed sufficient to hold [the] defendant responsible for the charge." Furthermore, Mr. Beaudet testified that the loans to M. & J.H. were part of the "$2.8 million in loan proceeds" referred to in the Information. Therefore, we think it is proper to consider those loans as part of the scheme which was alleged in Count 1 of the Information and to order restitution for the Bank's losses because of the loans.

IV.  Selling costs

The Bank estimates $2,500.00 in "selling costs" for each loan's collateral, for a total of $12,500.00. This was described by Mr. Beaudet as an estimate of costs relating to inspections, repairs and other costs, such as closing costs, which are often incurred when the Bank sells property. Defendant contends that this is more of a guess than an educated estimation. Defendant asserts that a more accurate estimate would be $765.00 which is the cost of title insurance for a property valued at $170.000.00. See

Defendant's Exhibit 1.

The court considers Mr. Beaudet to be a credible witness with broad experience in his field. He is the only witness who supplied testimony regarding regular "selling costs" in this situation. These costs, by his testimony, are more than just the cost of title insurance. The value of the property to the Bank is less, if as a matter of regular occurrence, the Bank should be expected to expend money on "selling costs" in order to liquidate the property. The estimate of "selling costs" is supported by credible testimony and a preponderance of the evidence. Therefore, the court finds that the Government has adequately supported this element of its proposed restitution figure.

V.   10% estimated discount

Mr. Beaudet estimated a 10% discount from the Bank's figure of the appraised value of the property. Thus, if a property was appraised at $170,000, the Government contends that the value of the property to the Bank is $17,000 less because bank-owned properties sell for that much less than the appraised value as a matter of historical performance. On the "other real estate owned" (OREO) fact sheets prepared by the Bank, this discount is listed with regard to the value of the property held by the Bank. Government Exhibit 4.

Defendant contends that there is insufficient evidence that this discount will actually occur when the properties are sold.

The court disagrees. The court finds that the preponderance of the evidence in this case favors the Government, who supplied the testimony of an experienced and credible witness. The court is attempting to determine the value of the property to the victim in this case as an offset to the loss of loan proceeds. This is a matter of opinion. The court finds that the application of the discount is a reasonable facet of Mr. Beaudet's opinion and that it is supported by the evidence in the record.

VI.  Appraised value of the property

The Government has presented evidence of appraisals of the property at issue prepared by a certified appraiser, Steven J. Martens and Andrew J. Pfister, an appraiser who worked with Mr. Martens on the appraisal of the duplexes. Government Exhibits 11 and 12. The Martens appraisal took a portfolio approach to determining the value of 13 duplexes located in southeast Topeka, Kansas, including the duplexes at issue in this case. That is, the appraisal assumed that the 13 duplexes would be sold as a portfolio. But, the appraisal also included a table which presented an adjustment of the individual duplexes' value according to location, features, and condition. Government Exhibit 11 at p. 6. The appraisal used both an income approach and a sales comparison approach to determining the value of the duplexes. The single family house was appraised using a sales comparison approach. The Martens appraisal included an interior inspection of

four duplex units, but no other property.

Defendant presented testimony and exhibits through Belinda Atkins, a residential valuation manager for the Shawnee County Appraisers Office. Ms. Atkins testified that she did not personally appraise the properties at issue in this case. She said her office attempts to determine current market value each year based on comparable sales data and market trend analysis. Her office takes into account relevant details and amenities regarding the properties and uses a multiple regression analysis to make adjustments. She testified that sales and county values were very closely aligned. She also stated that duplexes are valued on a per unit basis by her office. It does not appear that an interior inspection provided information for the appraisal made by her office.

Martens, Pfister and Atkins appear well-qualified in the field of property appraisal, but the appraised values for the same properties are substantially different. The court shall side with the appraisals performed by Mr. Martens for the following reasons. First, the Martens appraisal of the duplexes uses an income and a sales comparison approach and then blends the values. This is an advantage in the court's opinion because the duplexes may be purchased with renting in mind. Second, the Martens appraisal of the duplexes uses comparable sales figures and makes adjustments which are more convincing to the court. Three of the comparable

sales in the Martens appraisal are sales in 2011 of duplex units in the 4400 block of Southeast Michigan. Three of the duplexes at issue in this case are in the 4300 or 4400 block of Southeast Michigan. The Shawnee County Appraiser does not use comparable sales from the neighborhood on Southeast Michigan. The Martens appraisal makes negative adjustments of $10,000 to $15,000 to the sales value of the duplex units. These adjustments are based upon considerations of location, features and condition. The result is a value which is close to a September 2011 sale price of a duplex on 4416 Southeast Michigan. The Shawnee County Appraiser makes large positive adjustments of approximately $30,000 to $45,000 to the sale prices of comparable duplexes. These adjustments do not inspire the court's confidence.

As for the single-family house, in addition to other comparable sales, the Martens appraisal and the Shawnee County Appraiser used a comparable sale from the same neighborhood. The Martens appraisal made a negative adjustment after comparing the exterior conditions of the two houses. The Shawnee County Appraiser made a positive adjustment. Given the explanation set forth in the Martens appraisal, the court finds this appraisal more persuasive as to the value of the single-family house.

While defendant has criticized the portfolio approach in the Martens appraisal, the court believes the figures provided in the appraisal are reliable and consistent with sales of individual

units.  Furthermore, the appraisal did make individual adjustments relating to the individual properties in question.  The court also acknowledges the contract submitted as defendant's exhibit 10.  This contract lists a sales price of $262,500 for a duplex at 4326 Southeast Michigan.  While the court has considered this information, the court shall not give it much weight because it appears inconsistent with both appraisals and inconsistent with what Ms. Atkins testified was a negative market trend.

VII. Summary

The court has given careful consideration to the evidence and arguments regarding restitution.  The court finds the figure supported by the government is a reasonable determination of the Bank's actual loss from the offense of conviction and that it is supported by the preponderance of the evidence.  Therefore, the court shall order restitution in the amount of $712,144.89.

**IT IS SO ORDERED.**

Dated this 21st day of June, 2012 at Topeka, Kansas.

           s/Richard D. Rogers
           United States District Judge